Edward C. Hopkins Jr. SBN# 028825
Alexandra Tracy-Ramirez SBN# 028570
**HOPKINSWAY PLLC**
7900 E. Union Ave., Ste. 1100
Denver, Colorado 80237
(720) 262-5545 tel | (720) 262-5546 fax
ehopkins@hopkinsway.com
atracyramirez@hopkinsway.com
*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| FireClean LLC, a limited liability company; David Sugg, an individual; and Edward Sugg, an individual; | No. |
| | **COMPLAINT AND DEMAND FOR JURY TRIAL** |
| Plaintiffs, | |
| vs. | 1. **Defamation (21 Counts)** |
| | 2. **Injurious Falsehood (Trade Libel) (21 Counts)** |
| Andrew Tuohy, | 3. **15 U.S.C. § 1125(a)(1)(B) (Lanham Act) Violation** |
| Defendant. | 4. **Intentional Interference with Business Relations** |
| | 5. **False Light Invasion of Privacy** |

Plaintiffs David Sugg, Edward Sugg, and FireClean LLC (FireClean) bring this Complaint and Demand for Jury Trial against Defendant Andrew M. Tuohy and allege as follows, upon personal knowledge as to their own acts and experiences, and, as to other matters, upon information and belief, including their attorneys' investigations.

## PARTIES

1.      Plaintiff FireClean is a privately-held, Virginia Limited Liability Company headquartered in Virginia.

2.     Plaintiffs Edward and David Sugg are private figures residing in Virginia.

3.     Defendant Andrew M. Tuohy is an individual residing in Arizona.

**JURISDICTION AND VENUE**

4.     This Court has original jurisdiction over this civil action pursuant to 28 U.S.C. § 1338(a) and (b), 28 U.S.C. § 1331, and 15 U.S.C. § 1121(a).

5.     By this action, FireClean asserts claims that arise under 15 U.S.C. § 1125(a)(1)(B) (Lanham Act) and common law Arizona tort claims.

6.     This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over claims herein which are not based upon federal statute, since these claims are so related to claims in this action that are within the Court's original jurisdiction that they form part of the same case or controversy.

7.     This Court also has subject matter jurisdiction under 28 U.S.C. § 1332 because there is complete diversity of citizenship between the Plaintiffs and the Defendant; and the amount in controversy exceeds the sum of $75,000.00, exclusive of interest and costs.

8.     Edward and David Sugg are residents of the Commonwealth of Virginia and FireClean is a Virginia company; whereas Mr. Tuohy is a resident of the State of Arizona.

9.     Each Plaintiff seeks damages that exceed $75,000.00 for the harms Mr. Tuohy's tortious conduct caused.

10.    FireClean lost more than $75,000.00 in profits due to Mr. Tuohy's tortious conduct after Mr. Tuohy published his first disparaging article about FireClean.

11.    Edward Sugg and David Sugg have each suffered and will each suffer reputational and mental harm as a direct result of Mr. Tuohy's tortious actions.

12. The value of the harms Edward Sugg and David Sugg have each suffered exceeds $75,000.00.

13. The reputational harm Edward Sugg and David Sugg have each suffered is worth at least $100.00 per day beginning on the first day Mr. Tuohy published the statements giving rise to this action.

14. The mental harm Edward Sugg and David Sugg have each suffered is worth at least $100.00 per day beginning on the first day Mr. Tuohy published the statements giving rise to this action.

15. Venue in this Court is proper under 28 U.S.C. §§ 1391(b)(1) because the only defendant, Mr. Tuohy, is a resident of the State of Arizona in which the District Court of Arizona is located.

## INTRODUCTION

16. Mr. Tuohy lives in Oro Valley, Arizona.

17. He works in Tucson, Arizona.

18. He is employed as a hiking guide.

19. Mr. Tuohy has claimed to have "experience with weapons and 'tactical' gear, from both field use and practical design standpoints."

20. He is an avid social media user.

21. He is the controller, owner, manager, editor, and publisher of a blog called Vuurwapen Blog.

22. He authors stories and other statements that he publishes via Vuurwapen Blog.

23. Members of the general public may access and read Vuurwapen Blog's publications at the following website address: www.vuurwapenblog.com.

24. Public registrant contact records for www.vuurwapenblog.com state the website's registrant's contact's:

   a. Name is Andrew Tuohy;

   b. Address is 12117 N. Makayla Canyon Ln.;

   c. City is Oro Valley;

   d. State is Arizona;

   e. Postal Code is 85755;

   f. Country is United States;

   g. Phone is (520) 908-7100; and

   h. Email is andrew.tuohy@gmail.com.

25. As the creator, owner, manager, editor, and publisher of Vuurwapen Blog, Mr. Tuohy controls which statements get published, which statements do not get published, which statements get deleted after being published, and which statements do not get deleted after being published via www.vuurwapenblog.com.

26. Vuurwapen Blog invites, encourages, helps, and authorizes its readers, users, or business relations to publish statements through www.vuurwapenblog.com.

27. Members of the general public may access and read the statements Vuurwapen Blog invites, encourages, helps, and authorizes its readers, users, or business relations to publish through the website www.vuurwapenblog.com.

28. As the creator, owner, manager, editor, and publisher of Vuurwapen Blog, Mr. Tuohy controls which statements authored by Vuurwapen Blog's users, readers, or business relations get published, which statements do not get published, which statements get deleted after being published, and which

1    statements do not get deleted after being published via

2    www.vuurwapenblog.com.

3    29.    Mr. Tuohy maintains various social media accounts related to Vuurwapen Blog

4    including Facebook, Google+, Instagram, Twitter, and Tumblr accounts and a

5    YouTube video channel where he posts content related to the blog.

6    30.    Mr. Tuohy publishes a podcast titled "Vuurwapen Blog Radio."

7    31.    Through Vuurwapen Blog and social media accounts, he publishes content

8    related to guns and weaponry, including reviews of gun-related products,

9    accessories, and policies.

10   32.    Mr. Tuohy promised to comply with the terms of use agreements, user

11   agreements, acceptable use policies, community standards, or other similar

12   standards of conduct pertaining to third party beneficiaries that all Facebook,

13   Google+, Instagram, Twitter, and Tumblr users promise to comply with when

14   they use these companies' social media services to publish content online.

15   33.    Mr. Tuohy also operates a clothing business in the State of Arizona.

16   34.    He owns, controls, or manages this clothing business.

17   35.    Mr. Tuohy markets through the website www.vuurwapenblog.com the clothing

18   his clothing business sells.

19   36.    Mr. Tuohy markets the clothing his clothing business sells

21   a.   to gun owners;

22   b.   people who use gun oil;

23   c.   people who have considered using FireClean products; and

24   d.   people who have used FireClean products.

25

26

37.  Mr. Tuohy publishes stories and other statements via www.vuurwapenblog.com and enables third parties to publish statements via www.vuurwapenblog.com to market his clothing business.

38.  Mr. Tuohy and his clothing business receive payments through online financial payment services offered by PayPal Holdings, Inc. (PayPal).

39.  Mr. Tuohy instructs his clothing business's customers to pay for the clothing they buy from his business by using the financial services PayPal makes available through its website, www.paypal.com.

40.  Mr. Tuohy promised to comply with the PayPal User Agreement.

41.  When Mr. Tuohy agreed to comply with the PayPal User Agreement he promised PayPal and third party beneficiaries of his contractual agreement with PayPal that he would not do any of the following "[i]n connection with [his] use of [the PayPal] website, [his PayPal] Account, the PayPal Services, or in the course of [his] interactions with PayPal, other Users, or third parties":

   a.  "Violate any law, statute, ordinance, or regulation (for example, those governing financial services, consumer protections, unfair competition, anti-discrimination or false advertising);"

   b.  "Infringe PayPal's or any third party's copyright, patent, trademark, trade secret or other intellectual property rights, or rights of publicity or privacy;"

   c.  "Act in a manner that is defamatory, trade libelous, threatening or harassing;" or

   d.  "Provide false, inaccurate or misleading information."

42.  Mr. Tuohy instructed his clothing business's customers to pay for their purchases by sending money to the PayPal account associated with the email address 545ar15@gmail.com.

43. The Arizona Corporation Commission allows the general public to search its public records online via the website ecorp.azcc.gov to determine if a business or trade name was registered with the State of Arizona and, if it was, whether the business that registered it is in good standing.

44. According to the Arizona Corporation Commission records that may be accessed and viewed via ecorp.azcc.gov, Mr. Tuohy did not register any of the following business or trade names in the State of Arizona:

   a. Vuurwapen;

   b. Vuurwapen Blog;

   c. www.vuurwapenblog.com;

   d. 545ar15@gmail.com; or

   e. andrew.tuohy@gmail.com.

45. Mr. Tuohy uses Vuurwapen Blog and social media accounts to promote himself, his expertise, his services, and his clothing business.

46. Mr. Tuohy's blog is widely read within the diverse community of gun and weapon owners, gun oil users, retailers, members of the military, and gun aficionados.

47. Each of Vuurwapen Blog's publications gets widespread publicity to the public at large.

48. Mr. Tuohy contributes as a writer, occasionally, to other websites, including www.thefirearmblog.com.

49. The sites to which Mr. Tuohy contributes have similar target audiences in the gun community.

50. These sites' publications get widespread publicity to the public at large.

# GENERAL ALLEGATIONS

**Mr. Tuohy's Relationships with the Sugg Brothers, FireClean, and George Fennell**

51.     Mr. Tuohy met David Sugg in January or February 2011 when both attended a rifle class in Tucson, Arizona.

52.     They kept in touch after their initial meeting.

53.     The two met up again approximately one year later in February 2012 when David Sugg was in Tucson.

54.     David Sugg told Mr. Tuohy he and his brother, Edward Sugg, were in the process of developing a new firearms lubricant.

55.     The lubricant FIREClean® is a patent-pending product developed by FireClean LLC, a company David Sugg and Edward Sugg (collectively, "Sugg Brothers") founded.

56.     FIREClean® is a proprietary product that helps prevent and reduce the build-up of carbon residue on firearms.

57.     During their meeting in 2012, David Sugg asked Mr. Tuohy if he would be interested in testing FIREClean®.

58.     Mr. Tuohy agreed and conducted a test of FIREClean® in the summer of 2012 during Mr. Tuohy's brief employment with ammunition retailer Lucky Gunner.

59.     The test results were published in January 2013.

60.     Although they did not initially reference FIREClean® by name, the results were favorable and well-received.

61.     Between its development date in 2012 and September 2015, FIREClean® was a successful product.

62.     FireClean LLC's revenue increased steadily by twenty to fifty percent annually since sales began in 2012.

63.   In the summer of 2015, George Fennel, one of FireClean's commercial competitors started a false rumor about FIREClean®, David Sugg, and Edward Sugg.

64.   Mr. Fennell falsely claimed FIREClean® is repackaged generic cooking oil, such as soybean oil or canola oil or repackaged Crisco-brand oil.

65.   This allegation falsely accused FireClean of illegally or unlawfully deceiving and defrauding its consumers.

66.   Mr. Tuohy claims he became aware of the rumor and wanted to participate in the perceived controversy within the gun community about FIREClean®.

67.   He decided to write a story about FIREClean®.

68.   In September 2015, Mr. Tuohy published his first disparaging story about FIREClean®, FireClean, and the Sugg Brothers.

69.   The story contained false, misleading, deceptive, and disparaging statements about FIREClean®, FireClean, and the Sugg Brothers.

70.   Mr. Tuohy claimed "FireClean is probably a modern unsaturated vegetable oil virtually the same as many oils used for cooking."

71.   Mr. Fennell later took credit for encouraging or helping Mr. Tuohy to publish stories about FIREClean®, FireClean, and the Sugg Brothers.

72.   Mr. Tuohy published his first story and other stories about FIREClean®, FireClean, and the Sugg Brothers through Vuurwapen Blog.

73.   The statements Mr. Tuohy authored specifically about FIREClean®, FireClean, and the Sugg Brothers were published to the public at large, read widely, and commented upon.

74. Online reviews and comments about FIREClean®, FireClean, and the Sugg Brothers, including reviews on Amazon.com, confirm Mr. Tuohy's comments damaged the Plaintiffs' reputations.

75. Because Mr. Tuohy published his statements, FireClean's revenues and profits decreased since September 2015.

76. FireClean's future revenues and profits will be lower than they would have been because Mr. Tuohy published his derogatory statements.

77. In just the first few months after Mr. Tuohy published his first statements about FireClean, FireClean's revenues fell by over $25,000.00 per month.

78. Mr. Tuohy's statements remain online and continue to garner attention and cause harm to the Plaintiffs.

79. Mr. Tuohy continues to publish statements about FireClean to draw attention to the controversy his publications caused, harm FireClean, bolster his own reputation, drive traffic to Vuurwapen Blog and related social media accounts, and sell more clothing.

**FIREClean® and Its Development**

80. In May 2012, the Sugg Brothers formed FireClean in Virginia and began distributing and selling a product they developed and named FIREClean®.

81. The FIREClean® product is not marketed or sold under any other name, label, or brand.

82. FIREClean® is a proprietary product that improves the reliability and performance of firearms by reducing the adhesion of carbon residue that results from discharging a firearm.

83. The product functions as a firearm lubricant, often referred to as gun oil.

84. A thin layer applied to the areas of a firearm that are subject to friction and fouling will form a thin protective layer against carbon and other fouling.

85. As its patent application states, FIREClean® may consist of a proprietary blend of at least three "natural, non-petroleum, non-synthetic oil[s] derived from a plant, vegetable or fruit or shrub or flower or tree nut, or any combination of natural, non-petroleum, non-synthetic oils derived from a plant, vegetable or fruit or shrub or flower or tree nut," where each oil has a smoke point above 200 degrees Fahrenheit, and the total volume of the at least three oils is at least 25% of the total volume of the oil composition. The patent application is attached as Exhibit A.

86. FIREClean® contains at least one high-oleic oil, or highly monounsaturated fatty acid, which is preferred over significantly polyunsaturated fatty acids (found in most common vegetable oils), due to the performance, stability and non-drying, and non-gumming nature of high-oleic oils. The use of high-oleic oils also enhances the temperature range and storage stability of the substance. (Ex. A at 8.).

87. FIREClean® is not made from a single type of oil.

88. FIREClean® is not Crisco Canola Oil.

89. FIREClean® is not common canola oil.

90. FIREClean® is not Crisco Vegetable Oil, which is soybean oil.

91. FIREClean® is not common soybean oil.

92. FIREClean® is not a re-labeled or repackaged pre-existing consumer or retail product.

**September 12, 2015**
**Mr. Tuohy publishes "Lies Errors and Omissions; Infrared Spectroscopy of FireClean and Crisco Oils."**

93. After deciding to write a story about FIREClean®, Mr. Tuohy contacted Edward Sugg through a Facebook message.

94. Mr. Tuohy asked Edward Sugg whether he had a response to a competitor's claims that FIREClean® was plain cooking oil or Crisco-brand oil.

95. In the August 29, 2015, message, Mr. Tuohy asked: "Ed, Do you guys have a response to the claims that FireClean is just Crisco? Andrew." (Exhibit B.)

96. Edward Sugg replied to the message, categorically denying the allegations: "Hi Andrew-categorically deny. If you let me know where you are hearing it I would appreciate it. If it's a competitor it will generate a strong response. Thanks! Ed." *Id.*

97. Unknown to FireClean at the time, Mr. Tuohy was in contact with George Fennell.

98. Mr. Tuohy asked Mr. Fennell for more information.

99. Mr. Fennell refused to provide any evidence to substantiate his false rumors that FIREClean® is repackaged Crisco oil.

100. Despite having denials directly from one of FIREClean®'s developers and a lack of evidence from the rumors' initiator, on September 12, 2015, Mr. Tuohy published statements that claimed FIREClean® is virtually the same as common cooking oil: "FireClean is probably a modern unsaturated vegetable oil virtually the same as many oils used for cooking." Ex. C at 4.

101. The statement appeared in a blog post Mr. Tuohy published titled, "Lies Errors and Omissions; Infrared Spectroscopy of FireClean and Crisco Oils." The story, referred to as the "Spectroscopy Article," is attached as Exhibit C.

102.   The story is also publicly available at:

http://www.vuurwapenblog.com/general-opinion/lies-errors-and-omissions/ir-spectra-fireclean-crisco/.

103.   The following spectra for three different substances were published with the story:



104.   In the Spectroscopy Article, Mr. Tuohy wrote that the "makers of FireClean, Ed Sugg... assured me that not a single drop of Crisco has ever been part of

their formulation ...” but that “[d]espite these assurances, which I was inclined to believe, I sought to undertake my own testing to determine whether or not these claims are true about FireClean. Trust, but verify.” Ex. C at 2.

105.   In the story, Mr. Tuohy claimed he obtained the assistance of an unnamed professor, a “very nice man” at the University of Arizona, who, according to Mr. Tuohy, volunteered his services and performed an infrared spectroscopy analysis of FIREClean®, Crisco Vegetable Oil, and Crisco Canola Oil.

106.   Mr. Tuohy’s derogatory statements alongside the side-by-side spectra, which are scaled differently, convey the false and disparaging notion that FIREClean® is Crisco Vegetable Oil, Crisco Canola Oil, or a single common cooking oil.

107.   Mr. Tuohy’s published false statements about FIREClean®’s contents and the meaning of the test results even though Mr. Tuohy knew the statements were false or because he recklessly disregarded whether they were true or false.

108.   Because FIREClean®, Crisco Canola Oil, and Crisco Vegetable Oil each contain plant or vegetable-based oils from the same class of triacylglyceride compounds, similar results are expected.

109.   Infrared spectroscopy is not a scientifically suitable method for comparing oils from the same class of compounds because it cannot accurately determine the differences between FIREClean® and similar, but different substances.

110.   Nor can it compare or analyze the fat saturation levels of plant-based oils.

111.   The spectra below are of three different substances: the mass-merchant 2-cycle oil is oil used for mixing into fuel for power equipment such as chain saws and grass trimmers; the two different “5W30” oils are car engine oils, with one being conventional mass-merchant oil and the other, a fully-synthetic brand.

112.   The spectra are similar, as with the spectra comparing FIREClean® to Crisco.



113.    Yet, these are three different substances, with different uses.

114.    Mr. Tuohy's published analysis is not scientifically sound.

115.    It included no controls.

116.    It analyzed no other substances, whether plant or vegetable-based, or otherwise.

117.    The analysis failed to evaluate whether many oils or oil blends would have similar basic patterns.

118.    The similar spectra for different Crisco oils (e.g. Crisco Canola and Crisco soybean) should have been an obvious indicator of the unsuitability of this analysis.

119.    Mr. Tuohy also failed to perform any other number of tests that could help determine whether the substances are the same.

120. Mr. Tuohy also quoted the anonymous professor as saying: "I don't see any sign of other additives such as antioxidants or corrosion inhibitors. Since the unsaturation in these oils, especially linoleate residues, can lead to their oligomerization with exposure to oxygen and light, use on weapons could lead to formation of solid residues (gum) with time. The more UV and oxygen, the more the oil will degrade." (Ex. C at 4-5, emphasis omitted).

121. Based on these purported facts, Mr. Tuohy wrote that he could not recommend FIREClean® be used for military purposes or by military members "[g]iven that people in the military are often exposed to both UV and oxygen (such as when they go outdoors) and also need corrosion protection for their firearms."

122. In the comments section below the main text of the article, Mr. Tuohy stated that the "IR [infrared spectroscopy] data was sufficient" to draw the conclusion that FIREClean® is Crisco or canola oil. (Ex. C at 14).

123. The Spectroscopy Article (with its title, "Lies, Errors, and Omissions") also falsely implies that FireClean has misrepresented its product.

124. The Spectroscopy Article includes the following actionable statements:

   a. "Lies, Errors and Omissions; Infrared Spectroscopy of FireClean and Crisco Oils." (**Statement 1**).

   b. "FireClean is probably a modern unsaturated vegetable oil virtually the same as many oils used for cooking." (**Statement 2**).

   c. "[g]iven that people in the military are often exposed to both UV and oxygen (such as when they go outdoors) and also need corrosion protection for their firearms, I would not recommend FireClean be used by members of the military." (**Statement 3**).

**September 14, 2015**
**Mr. Tuohy Posts "Where There's Smoke, There's Liars"**

125. Two days after publishing the Spectroscopy Article, Mr. Tuohy posted another article on Vuurwapen Blog: "Where There's Smoke, There's Liar."

126. After September 14, 2015, Mr. Tuohy changed the title of the article on his publication to, "Severe Problems with Vickers Tactical Video." However, the URL address for the article remains, by the date of filing this complaint, "http://www.vuurwapenblog.com/general-opinion/lies-errors-and-omissions/where-theres-smoke-theres-liar/." The "Smoke/Liar Article" and its comments is attached as Exhibit D.

127. On September 14, 2015, Mr. Tuohy also posted a link to the article on Facebook and Vuurwapen Blog with the statement, "Deliberately misleading the consumer in an effort to sell a product. Is there a word for that?" (Exhibit E.).  This actionable statement is referred to elsewhere in the complaint as **Statement 19**.

128. The article itself provides a link to a video posted to YouTube by an individual named Larry Vickers, who owns a company called Vickers Tactical, and entitled by Mr. Vickers as a "FireClean Lube Test."

129. The video depicts Vickers interviewing David Sugg and Edward Sugg, who describe the development of FIREClean® and perform an evaluation to demonstrate the comparative effectiveness between FIREClean® and another oil.

130. Until recently, the video was publicly available at: https://www.youtube.com/watch?v=SOOAsOCEJfQ.

131.    The lubricant comparison, shown in the video, consists of discharging two firearms in three rounds. First, the firearms are discharged with no lubricant, then with a military-grade lubricant CLP, and finally with FIREClean®.

132.    After the comparison, David Sugg and Edward Sugg observe and comment on the testing.

133.    In the Smoke/Liar Article, Mr. Tuohy claimed the Sugg brothers, alone or in concert with Vickers, rigged the filming to falsely position FIREClean as a more effective lubricant.

134.    To explain his unfounded theory, Mr. Tuohy stated:

> I'll bet you four bottles of FireClean that was a factory +P Cor-Bon load; +P loads being hotter and having more powder than standard, bargain ammunition like Prvi Partizan.  Barring that, it was a handload, with a smoky powder selected for maximum effect. . . . [I]t is indisputable that the cartridge fired for the FireClean demonstration was significantly different than the cartridges fired for the dry gun and CLP demonstrations . . . . No honest person with a basic understanding of the scientific method would use handloaded or +P ammunition in a comparison with standard pressure bargain priced ammunition if the comparison was meant to show differences between lubricants and their effect on how much smoke comes out of the chamber during firing . . . . Smoke after firing is put forth as evidence of a cleaner gun. The cleaner gun concept is central to the ethos of FireClean; it's even their URL.  Different ammunition was selected for the FireClean portion of the demonstration to give the appearance of more smoke and thus a cleaner gun. . . . All the information required to judge the integrity of statements made by FireClean is contained in that Vickers Tactical video.

135.    The article contained the following actionable statements:

a.    http://www.vuurwapenblog.com/general-opinion/lies-errors-and-omissions/where-theres-smoke-theres-liar/. (**Statement 4**).

b.    "Lies, Errors and Omissions, Severe Problems with Vickers Tactical Video." (**Statement 5**).

c.    "I made a discovery which calls into question any claim or statement made by FireClean as a company and Ed and Dave Sugg as individuals." (**Statement 6**).

d.    "No honest person with a basic understanding of the scientific method would use handloaded or +P ammunition in a comparison with standard

pressure bargain priced ammunition if the comparison was meant to show differences between lubricants and their effect on how much smoke comes out of the chamber during firing." (**Statement 7**).

    e.   "Different ammunition was selected for the FireClean portion of the demonstration to give the appearance of more smoke and thus a cleaner gun.... All the information required to judge the integrity of statements made by FireClean is contained in that Vickers Tactical video." (**Statement 8**).

136.   The article and its actionable statements explicitly and implicitly convey that FireClean dishonestly and intentionally used different ammunition for the FIREClean® firing, therefore falsifying the results to portray FIREClean® as more effective than CLP or no lubricant.

137.   FireClean did not rig the test or falsify its results.

138.   The ammunition used for all firings depicted in the video were standard pressure, factory-loaded, including factory remanufactured, ammunition.

139.   The ammunition used for the FIREClean® firing was not "handload" or "Cor Bon +P" rounds.

140.   The ammunition used for the FIREClean® firing was not materially different from the ammunition used for the CLP and no-lubricant demonstrations.

141.   Mr. Tuohy's accusations in this article, taken individually and when read together, are false and disparaging.

1

**Mr. Tuohy's Spectroscopy Article Gains More Attention**

2    142.   Following Mr. Tuohy's posts, a public controversy ensued which led to

3    widespread, groundless criticism of FireClean and the Sugg Brothers.

4    143.   For instance, on September 13, 2015, www.thefirearmblog.com (the "Firearm

5    Blog") reported on the Spectroscopy Article with an article entitled, "Yes, It's

6    True: FireClean is Crisco." (The "Firearm Blog Article," Exhibit F.)

7    144.   Several days later, the Firearm Blog changed the title to, "Yes, It's True:

8    FireClean is Vegetable Oil," however, the URL of the article remains:

9    "http://www.thefirearmblog.com/blog/2015/09/13/yes-its-true-fireclean-is-

10   crisco/."

11   145.   The article displayed a full-page color picture of a bottle of FIREClean®, at a

12   distorted size, next to a bottle of Crisco oil. (Ex. F.)

13   146.   The false connotation of the illustration is that the two products are equivalent

14   and the same.

15   147.   The image appears on the Firearm Blog's website as follows:

16

17

18

19



21

22

23

24

25

26

148. The author, Nathaniel Finch, posted a link to the Spectroscopy Article and wrote: "So, in short, to the best of my knowledge, FireClean is canola oil." (Ex. F at 5.)

149. When the Firearm Blog posted "Yes it's True: FireClean is Crisco" to its Facebook page, it was "shared" by over 17,400 Facebook followers in the first eight hours alone. (Exhibit G.)

150. The ramification of the widespread falsehoods about FireClean and its product is evident not only from the sharing of the Firearm Blog's posts and the comments on Vuurwapen Blog, but it is also apparent from third-party comments on various online retailers.

151. On Amazon.com, product review comments for FIREClean® turned negative. A copy of one Amazon.com product page for FIREClean® and its reviews is attached as Exhibit H.

152. Prior to September 12, 2015, FIREClean®'s reviews on Amazon were almost uniformly positive, with no reference to FIREClean® supposedly being equivalent to Crisco.

153. The only exception is a single review that originally appeared in October 2013 and which was updated to refer to FIREClean® being canola oil on September 29, 2015.

154. Yet, on September 13, 2015, just a day after Mr. Tuohy published his first statements, nine negative reviews were posted on Amazon.com. Nine Amazon users rated FIREClean® with one star, the lowest rating Amazon allows. The September 13, 2015 reviews are as follows:

a.   User "Sean Collins" titled a review "Over priced Crisco vegetable oil" and stated, "This is Crisco vegetable oil." This reviewer also re-posted the spectra image from Mr. Tuohy's September 12, 2015 blog post.

b.   User "James R. McCain, Jr." titled a review "A sucker born every minute" and stated, "Fire lean (sic) is nothing more thank (sic) canola oil. Crisco, Wesson Oil."

c.   User "M. Potter" titled a review, "I had two 4 ounce bottles of Pure Rapeseed Oil courtesy of the great people at Fire Clean LLC." This review stated, "So we were in the middle of baking some gluten free, sustainably sourced, all organic, artisinal Banana Bread and the recipe called for Rapeseed Oil, unfortunately when we rode our dutch-style single speed bicycles to Earth Fare and Whole Foods we found out that the mouth breathing cis-gendered sithlords there had not stocked any Organic Rapeseed Oil that day :( (micro-aggressions triggered!) Luckily, I had two 4 ounce bottles of Pure Rapeseed Oil courtesy of the great people at Fire Clean LLC, and it only cost me $31.49 (and free two-day shipping!). The Banana Bread turned out great, Rapeseed Oil is good if you want to cut back on your bad cholesterol levels and still enjoy all organic, gluten free banana bread patisseries!"

d.   User "Shawn Cathcart" posted a review titled, "Warning to consumers regarding FIREClean Gun Oil." The review quote Mr. Tuohy's September 12, 2015 post and stated, "Warning to consumers: An Infrared Spectroscopy test has proven that Fireclean Gun Oil is '...a modern unsaturated vegetable oil virtually the same as many oils used for cooking.'

…Users may find that this oil is a fine lubricant, but please be aware that if this analysis is true, this product is sold at an absolutely enormous markup."

e. User "John Freckleson" posted a review titled, "FRAUD." The review stated, "Recently the product has been chemically analyzed and has been revealed to be rebranded Crisco vegetable oil."

f. User "John4315" posted a review titled, "Crisco repakaged (sic) and mared up enormously" and stated, "This product has been exposed as nothing but cooking oil. You can get the same results for about 125 times less here. http://www.amazon.com/Crisco-Pure-Canola-Oil-48/dp/B00I8G79ES."

g. User "Charles W Story" posted a review titled, "The results of this poor man's spectroscopy were that FireClean and the canola oil…" This reviewer directly referenced Mr. Tuohy and posted, in relevant part, "Yesterday the inimitable Andrew Tuohy, a contributor to this blog, posted an article proving to me beyond any doubt that FIREClean is vegetable oil."

h. User "robert dorchak" posted a review titled, "Crisco is better." The review stated, "Shout out to all you fire clean fan boys that have been using Crisco to lube your guns for the past year."

i. User "Hodor" posted a review titled, "One Star" and stated, "Great oil but too expensive for daily cooking unless you're sponsored by them, which explains Larry Vickers' weight."

155. The negative, one-star reviews continued through the end of August 2016

156. Several negative, one-star reviews were published around the same dates Mr. Tuohy published his stories about FireClean, FIREClean®, and the Sugg brothers.

**October 23, 2015**
**Mr. Tuohy Posts "Lies, Errors and Omissions;**
**A Closer Look at FireClean and Canola Oil."**

157.   On October 23, 2015, Mr. Tuohy posted a third article about FIREClean®
entitled, "Lies, Errors and Omissions; A Closer Look at FireClean and Canola
Oil." (Exhibit I.) (The "Closer Look Article").

158.   As of the date of the filing of this Complaint, the Closer Look Article remains
available on Vuurwapen Blog at: http://www.vuurwapenblog.com/general-
opinion/lies-errors-and-omissions/a-closer-look-at-fireclean-and-canola-oil/.

159.   Mr. Tuohy also posted the Closer Look Article to the Vuurwapen Blog
Facebook page on October 23, 2015, and that post appeared as follows:



160.   In the Closer Look article, Mr. Tuohy purported to have obtained a second round of testing on FIREClean®, through Everett Baker, an undergraduate college student.

161.   Mr. Tuohy concluded that"…FireClean and Canola oil appear to be 'effectively' or 'nearly' identical." (Ex. I at 3.)

162.   According to Baker, Mr. Tuohy sent in samples of various substances, including FIREClean®. Mr. Baker's blog is attached as Exhibit J.

163.   Baker claimed to have performed spectroscopy and NMR testing on the substances.

164.   Baker concluded FIREClean® is canola oil.

165.   Mr. Tuohy published Baker's disparaging conclusion and echoed the same sentiment despite the fact that FireClean advised Baker, on or about October 29 and 30, 2015, that other tests demonstrated that FIREClean® is not canola oil.

166.   According to Baker, one of his own professors even advised him that his methods could not support his results, stating, Baker's result "isn't 100% conclusive…You do have other tests to provide additional evidence, though!" (Exhibit J at 2.)

167.   Baker sent a text message to Jonathan Gifford in which he admitted that his NMR data were not sufficient to conclude FIREClean® is canola oil.

168.   Mr. Tuohy disregarded the information proving FIREClean® is not canola oil.

169.   Mr. Tuohy posted Baker's purported NMR and spectra, and, as with the Spectroscopy Article, they show a similar basic pattern. (Ex. I at 3 & 4.)

170.   To an experienced and skilled scientist, the distinctions, and the impropriety of the spectroscopy test, would have been apparent.

171.    The NMR and spectroscopy Baker performed were too low resolution to rely on and were interpreted ineptly.

172.    To an average consumer, however, the falsity of Mr. Tuohy's conclusions is not as apparent.

173.    Mr. Tuohy stated, in relevant part:

> FireClean is, as stated previously on this blog, a common vegetable oil, with no evidence of additives for corrosion resistance or other features. The science is solid in this regard…I have absolutely no issue with the concept of making money (I applaud those who make money hand over fist) or taking a product from one sphere and introducing it to another. I think a certain amount of "finder's fee" is absolutely reasonable…What I do take issue with are attempts to mislead consumers and distort the facts. There is a line between being an aggressive and effective salesman and not being entirely truthful about your product, the way it works, or what it contains. It is my belief that FireClean crossed that line long ago—and that many of their recent statements are simply egregious.

(Ex. I at 6).

174.    Both in the post itself and in the comments, Mr. Tuohy made the following actionable statements:

a.    "Lies, Errors and Omissions; A Closer Look at FireClean and Canola Oil" (**Statement 9**).

b.    "According to every PhD who looked at the NMR results, FireClean and Canola oil appear to be 'effectively' or 'nearly' identical." (**Statement 10**).

c.    "However, it would be difficult to argue that vegetable oil possesses 'extreme heat resistance' when it is known to degrade in the presence of heat and oxygen…If you are comfortable with this on your firearms' internal components, then this would be a good product to use, otherwise a more thermally stable product might be in order." (**Statement 11**).

d.  "FireClean is, as stated previously on this blog, a common vegetable oil, with no evidence of additives for corrosion resistance or other features. The science is solid in this regard." (**Statement 12**).

e.  "I have absolutely no issue with the concept of making money (I applaud those who make money hand over fist) or taking a product from one sphere and introducing it to another. I think a certain amount of 'finder's fee' is absolutely reasonable…" (**Statement 13**).

f.  "That said, I don't think I could look someone in the eye and tell them that a bottle of vegetable oil was the most advanced gun lube on the planet, but those who can? Well, they're good salesman (sic), I guess." (**Statement 14**).

g.  "What I do take issue with are attempts to mislead consumers and distort the facts. There is a line between being an aggressive and effective salesman and not being entirely truthful about your product, the way it works, or what it contains. It is my belief that FireClean crossed that line long ago-and that many of their recent statements are simply egregious." (**Statement 15**).

h.  "A few weeks ago, FireClean said that putting canola oil on your firearm could have catastrophic results. Some people believed that, probably because they are stupid. I don't like it when people in political arguments call the other side stupid and I don't throw around the word stupid lightly. However, if you think that putting canola oil - an oil with a long history of use as an industrial lubricant for metal-to-metal contact -on your rifle is dangerous, but that putting FireClean on your rifle is safe, then you're stupid. There is no other way to define your level of intelligence and critical thinking." (**Statement 16**).

i. "More power to [FireClean] for having been able to sell something at a lOOx markup for three years, but they had to know the gravy train would come off the rails at some point. I admire their gusto for having done it and part of me wonders if I could look people in the eye and tell them they needed to spend $7.50 an ounce on some sort of cooking oil for their gun. I don't think I could." (**Statement 17**).

j. "But knowing that FireClean has been willing to manipulate testing to make themselves look good, why would you trust anything they say?" (**Statement 18**).

175. **Statements 9-18** falsely convey that FIREClean® is a repackaged common household product or simple, single vegetable oil.

176. **Statements 9-18** convey that use of FIREClean® will lead to corrosion of a firearm.

177. The statements above falsely convey that FireClean has simply "taken a product from one sphere and introduced it to another."

178. The statements above falsely convey that FireClean has deceived or defrauded its customers.

179. The Closer Look Article (with the title, "Lies, Errors, and Omissions") falsely implies that FireClean has disseminated false information about its product.

180. Readers of Mr. Tuohy's publication have left at least 68 comments on the Closer Look Article. The comments are attached in Exhibit I.

181. The comments include statements such as:

(a) "I have yet to use FireClean, and based on how they've handled things since this whole thing started, I probably never will." (Ex. I at 7.)

(b) "So I think the definitive test would be if someone whipped up a batch of

fries cooked in FireClean and did a taste test." *Id.* at 8.

(c) "This certainly is a slam dunk on the whole issue. So much science. And then more science, twice with Doctors. The world needs more of this." *Id.* at 9.

(d) "Andrew [Mr. Tuohy], this is exactly the sort of thing I've come to expect from your blog and one of the reasons I've continued to read. Thanks for being a beacon of truth and accuracy." *Id.* at 10.

(e) "I guess I got taken. I've used FireClean and it worked, but now with all this evidence and especially the video with LV, I no longer have any faith in this company." *Id.* at 11.

(f) "Now that you have put this one in its grave how about some write ups on AKs." *Id.* at 11.

182. These comments illustrate the damage of the Closer Look Article to the Plaintiffs' reputations.

**January 18, 2016**
**Mr. Tuohy Attacked FireClean on Facebook**

183. Early in 2016, Mr. Tuohy continued his attack campaign against the Plaintiffs.

184. On January 18, 2016, he posted to Facebook an article he had written for another website, www.luckygunner.com, in 2013, with the following introduction (also attached as Exhibit K):

"It has been just over three years since the LG brass/steel 40,000 round test was published. If you have not looked at it in a while, I would encourage you to do so again. There are lessons in there for everyone (including me). If we look at this photo from the article which I have selected, you can see one of the bolt carrier groups at the halfway point. This would be five thousand rounds with a brief scrub at 2500 rounds. It is filthy and has lots of carbon caked on. The contact points on the bolt are scraped clean by force of mechanical action. The oil used was Fireclean. Keep this photo in mind the next time you see an image of a dirty AR BCG with "10,000 rounds and no

cleaning" that looks much wetter and cleaner than this one. People lie for the strangest reasons but one of the more common reasons is to separate you from your money. Question people when they make statements you find hard to believe. Don't be a fool. Be an educated consumer."

(Ex. K).

185.  His post contains at least one actionable statement, "People lie for the strangest reasons but one of the more common reasons is to separate you from your money. Question people when they make statements you find hard to believe. Don't be a fool. Be an educated consumer." (**Statement 20**).

186.  The January 18, 2016, post was "liked" by at least 190 people, and "shared" by at least 160.

187.  Numerous people "commented" on the post, including one individual who posted a picture of Crisco on a grocery store shelf, with the comment, "Speaking of FireClean, is this a good deal?" To which Mr. Tuohy replied, "Canola oil. Go for the green cap." (Exhibit L.)

188.  Mr. Tuohy's statement, "Canola oil," as described above, is actionable and referred to as **Statement 21.**

189.  The January 18, 2016, post falsely connotes that FireClean has made misrepresentations about its product to defraud its customers.

190.  It also falsely connotes that FIREClean® is canola oil.

**Independent Laboratory Testing Results of FIREClean®.**

191.  FireClean commissioned testing by Petro-Lubricant Testing Laboratories ("Petro Lube") in Lafayette, New Jersey, to analyze and compare FIREClean® to Crisco Vegetable Oil and Crisco Canola Oil.

192.    Petro Lube performed eight separate analyses, including Fourier Transform Infrared ("FT-IR") spectroscopy, on each of the three oils, with these results (Petro Lube documentation also attached as Exhibit M):

| | Iodine Value | Kinematic Viscosity at 40° C | Kinematic Viscosity at 100° C | Pour Point | Flash Point | Fire Point | Specific Gravity |
|---|---|---|---|---|---|---|---|
| **Crisco Canola Oil** | 113 cg/g | 36.07 cSt | 8.069 cSt | -21 ° C | 324 ° C | 356 ° C | .9200 |
| **Crisco Vegetable Oil** | 132 cg/g | 30.92 cSt | 7.521 cSt | -6 ° C | 324 ° C | 356 ° C | .9230 |
| **FIREClean®** | 93.8 cg/g | 31.75 cSt | 8.364 cSt | -15 ° C | 325 ° C | 357 ° C | .9163 |

193.    An overlay of the FT-IR spectra of all three substances is also part of Exhibit M.

194.    The spectra demonstrate these three substances do have similar basic patterns, as is to be expected, but the above-referenced tests also demonstrate that a spectrographic analysis alone is not sufficient to draw the conclusion, in this situation, to a reasonable degree of scientific certainty, that two or more of the substances are identical.

195.    The Petro Lube test results prove that FIREClean® is not Crisco Canola Oil or Crisco Vegetable Oil.

196.    FIREClean®'s iodine value of 93.8 defines FIREClean® as a non-drying oil.

197.    A non-drying oil does not harden when exposed to air.

198.    A non-drying oil such as FIREClean® will not gum or form solid residue when exposed to air.

**FIRST CAUSE OF ACTION**
**Defamation**
**(21 Counts)**

199. Plaintiffs re-allege all preceding allegations as if set forth in full below.

200. All Plaintiffs bring this cause of action against the Defendant.

201. Mr. Tuohy authored and published at least three separate articles to Vuurwapen Blog about FireClean on September 12, 2015; September 14, 2015; and October 23, 2015. Within the respective articles, Mr. Tuohy published **Statements 1-18**.

202. In posting **Statements 1-18** to his online blog, Mr. Tuohy published them to a worldwide audience via the Internet.

203. Mr. Tuohy also published false statements about FireClean on his Facebook page on September 14, 2015, and January 18, 2016.

204. The September 14, 2015, post contains the following statement, labeled **Statement 19**:

a. "Deliberately misleading the consumer in an effort to sell a product. Is there a word for that?" (**Statement 19**).

205. In publishing it to a public Facebook page, Mr. Tuohy published **Statement 19** to a national and global audience.

206. The January 18, 2016, Facebook post contained **Statements 20-21**.

207. Mr. Tuohy published **Statements 20** and **21** post to a national and global Internet audience via his publicly available Facebook page.

208. **Statements 1-21** each disparage the Plaintiffs by imputing they lied and deceived the public about the composition and usability of FIREClean®.

209. **Statements 1-21** either directly state or imply FIREClean® 1) is a common cooking oil, 2) unsafe for military use or its listed uses and 3) FireClean and its

founders have lied or otherwise deceived consumers about the product and functionality.

210. FIREClean® is not repackaged, common, grocery store cooking oil.

211. Specifically, as stated in its patent application, FIREClean® contains at least three "natural, non-petroleum, non-synthetic oil[s] derived from a plant, vegetable or fruit or shrub or flower or tree nut, or any combination of natural, non-petroleum, non-synthetic oils derived from a plant, vegetable or fruit or shrub or flower or tree nut."

212. Yet, **Statements 1, 2, 4, 5, 6, 9, 10, 11, 12, 13, 14, 15, 16, 17,** and **21** falsely allege or imply that FIREClean® is common cooking oil, soybean oil, or Crisco.

213. FIREClean® is safe and effective for both military use and any of its listed purposes.

214. Yet, **Statements 3**, and **16** falsely allege or imply that it is not.

215. FIREClean® is effective in extreme conditions as it has a flash point of 325 degrees Celsius or 617 degrees Fahrenheit and will not become unstable or impede function at temperatures as hot as a firearm can withstand.

216. Yet, **Statement 11** falsely alleges or implies that FIREClean® is not an adequately thermally stable product.

217. FIREClean® will not cause corrosion or lead to weapon malfunctions when used as directed.

218. Yet, **Statements 3** and **12** implies it will cause corrosion and lead to malfunctions or at the very least possesses no anti-corrosive properties.

219. Plaintiffs did not lie to or mislead consumers about FIREClean® or its applications.

220.  FireClean has not published in-depth statements about FIREClean®'s content to the general public because its content is a closely-guarded secret.

221.  Yet **Statements 1, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, and 20** imply Plaintiffs lied to or otherwise deceived consumers.

222.  **Statements 6, 7, and 8** also wrongly imply Plaintiffs are untrustworthy, unethical, and unprofessional by alleging they improperly altered a test or its results to make it appear as though their product is more effective than it is.

223.  **Statements 13, 14, and 15** also wrongly insinuate or imply FIREClean® was a pre-existing product brought from one area of commerce to another and that its consumers have been misled about its worth and price.

224.  FIREClean® is not a pre-existing product that was repackaged or introduced from a different sphere of commerce and its price does not reflect a "finder's fee."

225.  Use of FIREClean® on a weapon is not dangerous when used as directed.

226.  Yet, **Statement 16** implies that FIREClean® is dangerous and may harm consumers who use it as directed.

227.  **Statements 1-21** are not expressions of opinion because they are stated as facts capable of being proven false by objective criteria.

228.  Mr. Tuohy uses the statements to imply his version of the facts is true, namely that FIREClean® is a common cooking oil, unsafe for military or its advertised uses, and that FireClean lied about its composition and functionality.

229.  Mr. Tuohy was not compelled to make **Statements 1-21**.

230.  He owed no one a duty to make or publish **Statements 1-21**.

231.  Mr. Tuohy voluntarily published **Statements 1-21**.

232.    Mr. Tuohy did not make **Statements 1-21** to any audience that aids in or serves the lawful protection of his own interests. Rather, he published the statements on his own personal blog and social media accounts.

233.    Mr. Tuohy did not make **Statements 1-21** to any audience that aids in or serves the lawful protection of consumer interests. Rather, he published the statements to his own blog and social media accounts.

234.    Mr. Tuohy did not make his statements to protect the interests of any of his readers but rather to garner attention for himself, and later for his clothing business, by inserting himself into a situation he perceived as controversial.

235.    Recently, Mr. Fennell, a FireClean competitor, claimed responsibility for turning Mr. Tuohy's attention to spectroscopy analysis, and stated on his Facebook page that:

> And I'm sure everyone remembers the firestorm [Mr. Tuohy] set off **when he did what I told him to do** which started this whole spectral process that he's enamored with...compared FireClean to Crisco Oil...same deal…he saw my video where I said FireClean was pretty much a Crisco oil, long before Andrew did his spectra comparison and validated me then Didn't mean to get off track here, but just sharing the history behind these....it all started right here.

236.    At or before the time Mr. Tuohy published **Statements 1-21**, Mr. Tuohy had serious doubts about the veracity of his statements and a high degree of awareness that his statements were false or probably false.

237.    Prior to publishing **Statements 1-3**, Mr. Tuohy had a clear, unequivocal denial from Edward Sugg on whether FIREClean® was Crisco.

238.    Mr. Tuohy also had his own personal experience on the efficacy of FIREClean®.

239.    As recently as September 1, 2015—just days before publishing the Spectroscopy Article, Mr. Tuohy stated on his Facebook page that he has used

FIREClean® over "several years" and "tens of thousands of rounds," and had "zero complaints" about its performance.

240. Mr. Tuohy's September 1, 2015, Facebook post included a video demonstration of the firing of a dirty rifle that was lubricated with FIREClean® and then left uncleaned in storage for two years after firing corrosive surplus ammunition. The rifle was discharged and showed no evidence of impaired operation. There was also no mention that FIREClean® had caused corrosion to occur in any weapons.

241. The video may be found at the following URL:
https://www.youtube.com/watch?v=ixruuRYyKaE&feature=youtu.be.

242. In the video, Mr. Tuohy stated, "I am shooting it now to address concerns over whether or not FIREClean® causes the action to gum up over time if you let it sit for more than six to twelve months." After shooting for approximately twenty seconds, Mr. Tuohy examines the gun and states: "Magazine is clear, weapon is clear, all rounds fired without any malfunction."

243. Mr. Tuohy purposefully published false and misleading allegations to drive controversy and attract greater attention to himself at the expense of FireClean.

244. Mr. Tuohy wrote: "....I'm not terribly interested in determining the exact composition of the oil; the IR data is enough to satisfy the question at hand."

245. The same commenter replied: "Not really. We know nothing about the length of the carbon chains or their structure. All we know is that the functional groups are similar to Crisco, which any oil-like, plant based product would have."

246. Mr. Tuohy responded: "Well, you are most welcome to foot the bill for your own testing."

247. Mr. Tuohy's cavalier statements demonstrate his reckless disregard for the truth.

248. Mr. Tuohy's actions demonstrate malice and a blatant disregard for Plaintiffs' legal rights and the truth.

249. At the very least, Mr. Tuohy was negligent in determining the truth or falsity of **Statements 1-21** before making and publishing them.

250. Because of Mr. Tuohy's false statements and conduct, FireClean has been severely and permanently harmed.

251. Readers of Mr. Tuohy's first article, which contained **Statements 1-3**, have left at least 140 comments on the article (Exhibit C).

252. They include statements such as, "Guess I have to oil al [sic] my shit with a proper gun oil now. Snake oil won't do." *Id.* at 10.

253. The comments demonstrate
    a.  readers believed Mr. Tuohy's false assertions about Plaintiffs and
    b.  Plaintiffs' reputation was materially damaged because of Mr. Tuohy's statements.

254. Readers of Mr. Tuohy's Smoke/Liar Article which contained **Statements 4-8**, have left at least 84 comments on the article (Exhibit D) indicating their belief in and reliance on Mr. Tuohy's statements.

255. The comments include the following statements.
    a.  "The problem is they used different ammo for the FireClean gun, making the test completely irrelevant and the makers of the video liars." (Ex. D at 7.)
    b.  "Andrew's point wasn't about the quantity of smoke, it was that the test appears to be rigged." *Id.*

1        c.  "Man, I would love to be able to reference your info in a video to shut up

2        some of the people still supporting this product." *Id.* at 23.

3   256.  These statements show readers believed the assertions made in the

4        Smoke/Liar to be fact, and that FireClean's reputation was damaged as a result

5        of Mr. Tuohy's statements.

6   257.  Despite conclusive tests demonstrating FIREClean® is not repackaged cooking

7        oil, Mr. Tuohy's attack on Plaintiffs also has permeated the gun community's

8        social media.

9   258.  A simple Google search for "FireClean" reveals numerous websites, blog posts,

10       and other online commentary that has seized upon and discusses the

11       FireClean/Crisco comparison, and mocks FireClean.

12   259.  The same is true for a Google search of "FireClean Crisco" or "FireClean

13       Canola Oil."

14   260.  Only 1 one-star review had been posted via Amazon in the three-years prior to

15       Mr. Tuohy publishing **Statement 1**.

16   261.  After Mr. Tuohy published **Statement 1**, 38 one-star reviews were posted via

17       Amazon within one year.

18   262.  As recently as August 18, 2016, an Amazon user "Wool Wearer" posted a

19       review titled, "Don't believe the hype" and stated, Fireclean is nothing but

21       canola oil. Amazon Prime Pantry, sells 32oz bottle of Crisco oil is only $3.96.

22       That's 800% more vegetable oil than this two pack, for 87% less money. If it's

23       the flip-top bottles you're after, Amazon has much better deals on that also."

24   263.  Mr. Tuohy's statements severely and permanently damaged Plaintiffs'

25       reputations, their goodwill, and their business.

26

264.   FireClean lost approximately $150,000 in just a few months following Mr. Tuohy's first post.

265.   The company's future losses will be in the millions.

266.   **Statements 1, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, and 20** disparage Plaintiffs' reputations and business by accusing them of misleading consumers in ways that could cause financial harm and bodily injury.

267.   Because **Statements 1, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, and 20** are on their face inherently defamatory, the substantial injury to Plaintiffs is apparent.

268.   Plaintiffs are entitled to presumed damages for counts of defamation based on **Statements 1, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, and 20**.

**SECOND CAUSE OF ACTION**
**Injurious Falsehood (Trade Libel)**
**(21 counts)**

269.   Plaintiffs reassert and re-allege all preceding paragraphs as if set forth in full below.

270.   All plaintiffs bring this cause of action against the Defendant.

271.   In publishing **Statements 1-21** about Plaintiffs and their product, Mr. Tuohy intentionally made his disparaging statements to a vast, third-party audience.

272.   His statements, **Statements 1-21**, disparaged Plaintiffs and FIREClean®.

273.   The statements disparaged Plaintiffs by alleging or implying they are unethical and untrustworthy.

274.   The statements disparaged FIREClean® by alleging or implying FIREClean is made of a single common cooking oil; it is a potentially harmful product at worst, no better than cooking oil at best; and that it is not worth its sale price.

275.   FIREClean® is not repackaged Crisco oil, common canola oil, or common soybean oil.

276.   As shown by independent third-party tests Petro Lube performed, FIREClean® is not Crisco oil, common canola oil, or common soybean oil.

277.   Yet, **Statements 1, 2, 4, 5, 6, 9, 10, 11, 12, 13, 14, 15, 16, 17,** and **21** falsely allege or imply that FIREClean® is common cooking oil, soybean oil, or Crisco.

278.   Plaintiffs have not lied to or misled consumers about FIREClean® or its applications.

279.   Yet **Statements 1, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, and 20** imply that Plaintiffs lied or otherwise deceived consumers.

280.   **Statements 6, 7, and 8** also wrongly imply Plaintiffs are untrustworthy, unethical, and unprofessional by alleging they improperly altered a test or its results to make it appear as though their product is more effective than it is.

281.   **Statements 13, 14, and 15** also wrongly insinuate or imply FIREClean® was a pre-existing product brought from one area of commerce to another and that its consumers have been misled about its worth and price.

282.   FIREClean® is not a pre-existing product that was repackaged or introduced from a different sphere of commerce and its price does not reflect a "finder's fee."

283.   Use of FIREClean® on a weapon is not dangerous when used as directed.

284.   Yet, **Statements 3** and **16** imply or allege that FIREClean® is unfit for its advertised purposes and may be dangerous to or may harm consumers who use it as directed.

285.   Mr. Tuohy, when he published each statement, knew that his disparaging statements were false and misleading.

286. As alleged in this Complaint, Mr. Tuohy had received a categorical denial that FIREClean® is a common cooking oil before he published **Statement 1**.

287. He published **Statements 1-21** after receiving the denial from the people most likely to know FIREClean®'s exact contents.

288. Mr. Tuohy was motivated to publish **Statements 1-21** out of his own self-interest and his desire to dissuade consumers from doing business with Plaintiffs.

289. In **Statement 3**, Mr. Tuohy attempted to dissuade any military professionals or individuals with military weapons from using FIREClean® by implying it would not hold up under standard or extreme conditions.

290. In **Statement 15**, Mr. Tuohy blatantly accused Plaintiffs of attempting to "mislead consumers and distort the facts" by not "being entirely truthful about your product, the way it works, or what it contains." This statement and similar sentiments expressed in **Statements 1, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 17, 18, 19, and 20** paint Plaintiffs as dishonest and disreputable.

291. **In Statement 16**, Mr. Tuohy, to discourage people from buying FIREClean®, told each of his readers "you're stupid" to think FIREClean® is safe.

292. **Statements 1-21** caused Plaintiffs pecuniary losses.

293. As previously alleged in this Complaint, numerous consumers saw and believed the statements Mr. Tuohy published.

294. Mr. Tuohy's readers understood his publications as statements casting doubt on Plaintiffs' trustworthiness and the quality of FIREClean®.

295. Mr. Tuohy's statements, **Statements 1-21**, were published with malice or evil motives towards Plaintiffs.

296. His statements, **Statements 1-21**, were designed and intended to injure Plaintiffs, and did injure them.

297. As previously alleged, FireClean lost no less than $150,000.00 in the first few months after Mr. Tuohy published **Statement 1**, and its future losses will be in the millions.

**THIRD CAUSE OF ACTION**
**False Advertising in Violation of 15 U.S.C. § 1125(a)(1)(B) (Lanham Act)**

298. Plaintiffs re-allege all preceding paragraphs as if set forth in full below.

299. Plaintiff FireClean brings this cause of action against the Defendant.

300. Mr. Tuohy, through his clothing business's dealings, and FireClean, through its business dealings, struggle against one another to gain commercial advantages in interstate commerce.

301. FireClean markets FIREClean® to gun owners and people who use gun oil.

302. FireClean spent money marketing its brand and its FIREClean® product so that each would be portrayed in a true and positive light in the marketplace.

303. Mr. Tuohy, through Vuurwapen Blog, markets his clothing business's products to gun owners and people who use gun oil.

304. Mr. Tuohy published false and derogatory statements about FireClean and FIREClean® via Vuurwapen Blog so that each would be portrayed in a false and negative light in the marketplace.

305. Mr. Tuohy used Vuurwapen Blog to market his clothing business.

306. Mr. Tuohy marketed and sold his clothing business's offerings to people who lived outside Arizona.

307. Mr. Tuohy published false and derogatory statements about FireClean and FIREClean® via Vuurwapen Blog to help him market his clothing business.

308. Mr. Tuohy also published false statements that misrepresented his ability to accurately analyze or determine FIREClean®'s contents.

309. Mr. Tuohy published false and derogatory stories about FireClean and FIREClean® to help him market his clothing business to people inside and outside Arizona.

310. Mr. Tuohy, by publishing false and derogatory stories about FireClean and FIREClean® to help him market his clothing business

    a. decreased the value of the goodwill FireClean had accumulated before September 12, 2015; and

    b. decreased the return on investment FireClean made or will make on money it spent marketing its brand and its FIREClean® product.

311. The statements Mr. Tuohy authored and published about FireClean and FIREClean® deceived or had the tendency to deceive his audience.

312. Mr. Tuohy's deception caused FireClean to lose no less than $150,000, and future losses that will be in the millions.

## FOURTH CAUSE OF ACTION
### Intentional Interference with Business Relations

313. Plaintiffs reassert and re-allege all preceding paragraphs as if set forth in full below.

314. Both plaintiffs bring this cause of action against the Defendant.

315. Prior to September 2015, Plaintiffs were actively engaged in sales of FIREClean®.

316. They had prospective and actual contracts and business relationships with individual consumers, small retail operations, government agencies, and larger retailers such as Amazon.com.

317.   Mr. Tuohy was aware of the contracts and business relationships.

318.   For example, Edward Sugg had informed Mr. Tuohy of the importance of Amazon.com to FireClean's business and sales.

319.   Mr. Tuohy also knew of FireClean's business relationship with Larry Vickers of Vickers Tactical with whom FireClean's managers had made a demonstration video published on YouTube.

320.   Mr. Tuohy intentionally interfered with FireClean's contractual and business relationships when he improperly published his false and disparaging statements, **Statements 1-21**.

321.   He actively sought to dissuade current, former, and prospective customers from purchasing FIREClean®.

322.   Comments to Mr. Tuohy's published articles indicate current, former, and prospective customers read Mr. Tuohy's disparagements and decided not to purchase FIREClean®.

323.   For example, as previously alleged, one commenter who posted under the name "Nelson" warned on Amazon: "Caution, I bought this and it contained Snake Oil in the form of Crisco Vegetables."

324.   Another reviewer, under the name "St8kout" stated, "But the stuff does indeed work pretty well and I'm using it myself. Of course, had I known I would have gotten mine from the supermarket."

325.   Mr. Tuohy knew his statements, **Statements 1-21**, were false before he made them.

326.   He did not make his statements in the best interests of anyone other than himself.

327. He likely made some of his statements at the direction of one of FireClean's competitors who took credit for starting the discussion of FireClean into which Mr. Tuohy unnecessarily inserted himself.

328. Numerous consumers and retailers read **Statements 1-21** and reasonably noted their cautions against FireClean and its product.

329. Prior to Mr. Tuohy publishing **Statement 1**, reviews of FireClean on places such as Amazon.com had been overwhelmingly positive.

330. Since the publication of **Statements 1-21**, FIREClean® has received nearly 40 single-star reviews, the lowest review status Amazon allows.

331. Mr. Tuohy broke his promises to comply with the PayPal User Agreement when he engaged in tortious conduct that gave rise to this civil action.

332. Mr. Tuohy engaged in improper conduct when he broke his promises to comply with the PayPal User Agreement.

333. Mr. Tuohy broke his promises to comply with the terms of use agreements, user agreements, acceptable use policies, community standards, or other similar standards of conduct for Facebook, Google+, Instagram, Twitter, and Tumblr users when he engaged in tortious conduct that gave rise to this civil action.

334. Mr. Tuohy engaged in improper conduct when he broke his promises to comply with the terms of use agreements, user agreements, acceptable use policies, community standards, or other similar standards of conduct for Facebook, Google+, Instagram, Twitter, and Tumblr users.

335. As previously described, Mr. Tuohy's actions caused Plaintiffs economic and noneconomic damages.

## FIFTH CAUSE OF ACTION
### False Light Invasion of Privacy

336. Plaintiffs David Sugg and Edward Sugg re-allege all preceding paragraphs as if set forth in full below.

337. Plaintiffs David Sugg and Edward Sugg bring this cause of action against the Defendant.

338. Mr. Tuohy intentionally published or caused to be published **Statements 1 through 21**.

339. In his statements, **Statements 1-21**, Mr. Tuohy placed David Sugg and Edward Sugg in a false light in the public by accusing them of lying, being unethical and deceptive, and misrepresenting FIREClean®.

340. Each of the **Statements 1-21**, when considered in its proper context, paints David Sugg and Edward Sugg in a false light.

341. **Statement 6** creates the false impression that David Sugg and Edward Sugg are not credible sources of information and are untrustworthy.

342. **Statement 8**, through its innuendo, implies David Sugg and Edward Sugg deliberately altered test results to make their product seem more effective.

343. **Statements 14, 15, 16, 17, 18, 19,** and **20** paint the false picture of David Sugg and Edward Sugg as unethical salesmen who intentionally misled consumers.

344. Mr. Tuohy knew or recklessly disregarded that his statements and the republications of his statements would increase the damage his false light statements would cause David Sugg and Edward Sugg.

345. Mr. Tuohy caused David Sugg and Edward Sugg to be portrayed out of context and in a false light in the minds of the audience to which Mr. Tuohy directed his publications.

346.   Being accused of unethical, deceptive, fraudulent behavior would be highly offensive to a reasonable person and in this case, Mr. Tuohy's false statements and innuendo about David Sugg and Edward Sugg were highly offensive.

347.   The false statements and innuendo were published to members of the diverse, but fairly close-knit gun and weapons communities intending to cause David Sugg and Edward Sugg dignitary and emotional harm.

348.   Mr. Tuohy intended for a wide audience to read and believe his statements and innuendo.

349.   Mr. Tuohy's readers read and believed his statements, as alleged in previous paragraphs of this Complaint.

350.   Arizona residents, Virginia residents, and other readers across the country read and believed Mr. Tuohy's false allegations of misrepresentation, deception, and other unethical behavior and business practices.

351.   As a direct result of Mr. Tuohy's invasions of David Sugg's and Edward Sugg's privacy David Sugg and Edward Sugg have suffered severe emotional distress, loss of quality of life, damage to their personal and professional reputations, loss of goodwill, and loss of competitive business advantages.

352.   The damages Mr. Tuohy's invasions of privacy have caused are significant, compounding, and ongoing.

WHEREFORE, Plaintiffs pray for the following relief:

A.   a preliminary and permanent injunction that will enjoin Mr. Tuohy from publishing any publications about Plaintiffs that are similar to or the same as any publication this Court finds to be unlawful;

B.    a permanent injunction that will compel Mr. Tuohy to delete permanently every publication that this Court finds invaded or invades David Sugg's and Edward Sugg's privacy to the extent Mr. Tuohy can delete from that privacy-invading publication from Internet without obtaining permission from third parties;

C.    a permanent injunction that will authorize Internet search engine companies to deindex from their search results any webpages containing any statements about Plaintiffs this Court finds to be unlawful;

D.    for a judgment declaring that each statement of the twenty-one named in this complaint that this Court finds unlawful is unprotected speech;

E.    for a judgment declaring that deindexing from search engine results every webpage this Court finds unlawful will not infringe Mr. Tuohy's First Amendment rights and will serve the interests of justice;

F.    for actual, compensatory, special, general, consequential, incidental, exemplary, punitive, and treble damages under the Lanham Act in an amount to be determined at trial;

G.    costs, attorneys' fees, and all other statutory damages provided under the Lanham Act;

H.    for special damages to be shown by the evidence presented at trial in this case or during a damages hearing if this Court enters a pre-trial judgment;

I.    for general damages to be shown by the evidence presented at trial in this case or during a damages hearing if this Court enters a pre-trial judgment;

J.    for punitive damages in an amount sufficient to punish Mr. Tuohy and deter others;

K.    for Plaintiffs' reasonable costs incurred during this civil action;

L.     for Plaintiffs' reasonable attorneys' fees incurred during this civil action;

M.     for prejudgment interest at the highest rate allowed by law;

N.     for postjudgment interest at the highest rate allowed by law; and

O.     any other relief this Court may deem appropriate.

DATED: September 11, 2016.

**HOPKINSWAY PLLC**

/s/ Edward C. Hopkins, Jr.
/s/ Alexandra Tracy-Ramirez
Edward C. Hopkins Jr.
Alexandra Tracy-Ramirez
*Attorneys for Plaintiff*

ORIGINAL of the preceding e-filed
on September 11, 2016.

By: /s/ Alexandra Tracy-Ramirez