**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| FireClean LLC, et al., | No. CV-16-00604-TUC-JAS (EJM) |
| Plaintiffs, | **ORDER** |
| v. | |
| Andrew Tuohy, | |
| Defendant. | |

Pending before the Court is Plaintiffs' Motion for Protective Order (Doc. 51) and Defendant's Motion to Compel Discovery Responses (Doc. 61). Both motions have been fully briefed and are ripe for ruling.

**I.     Factual and Procedural Background**

Plaintiffs filed this action on September 11, 2016 (Doc. 1) and filed their first amended complaint on February 8, 2017 (Doc. 11). This matter was originally assigned to United States District Judge Soto, and later referred to the undersigned for all pretrial proceedings and report and recommendation. (Doc. 50).

Plaintiffs Edward Sugg and David Sugg own FireClean LLC, a company that produces a weapon lubricant marketed under the name FIREClean ("FC"). (Doc. 47 at 2). Plaintiffs allege that Defendant Andrew Tuohy published false and disparaging statements against FC online and caused Plaintiffs economic and noneconomic harm. *Id.* Specifically, Plaintiffs allege that:

> Between September 12, 2015, and January 18, 2016, Mr. Tuohy, through his website and social media pages, widely published the false allegations that FIREClean® is a single oil, a common soybean or canola oil of the kind sold in U.S. grocery stores, not the proprietary blend of substances the Plaintiffs had informed their consumers it was. Mr. Tuohy claimed he had independently commissioned accurate and appropriate scientific tests that confirmed his statements were true. Mr. Tuohy falsely accused the Plaintiffs of deceiving their consumers by manipulating a comparison test between FIREClean® and another product that showed FIREClean® is the more effective lubricant. Mr. Tuohy also claimed that the Plaintiffs had overinflated the price of their product by charging at least 100 times what it cost to produce it, intentionally deceived the public, and engaged [in] unlawful deceptive trade practices.

*Id.* at 2–3.

Plaintiffs' first amended complaint states claims against Defendant for defamation, injurious falsehood (trade libel), false advertising (Lanham Act), intentional interference with business relations, false light invasion of privacy, and aiding and abetting tortious conduct. (Doc. 11). Defendant filed a motion to dismiss the defamation and Lanham Act claims (Doc. 26), and Judge Soto granted the motion in part and dismissed the Lanham Act claim (Doc. 42).

On January 12, 2018 Plaintiffs filed a Motion for Protective Order seeking to protect two expert reports. (Doc. 51). Plaintiffs allege that the documents contain proprietary information and trade secrets, and state that redisclosure of the reports would cause Plaintiffs irreparable commercial harm. Plaintiffs request that the Court enter an order ordering that 1) the two reports may only be used in this litigation; 2) the reports must be returned to Plaintiffs after conclusion of the litigation; and 3) that reasonable efforts be made to limit disclosure of the information contained in the reports. Defendant does not oppose an order protecting Plaintiffs' private financial information, but contends that the expert reports do not contain any information that qualifies for protection under Fed. R. Civ. P. 26(c). (Doc. 60).

On February 6, 2018 Defendant filed a Motion to Compel certain discovery responses. (Doc. 61). Defendant states that Plaintiffs are refusing to respond to

1  interrogatories about FC's ingredients because their formula is allegedly a trade secret.
2  Defendant contends that even if the formula is a trade secret, he is still entitled to
3  discovery, and that even if the Court enters a protective order, Plaintiffs cannot prevent
4  Defendant from obtaining relevant and exculpatory evidence. Plaintiffs argue that FC's
5  formula, source of components, method of production, and research and development are
6  all trade secrets, and that Defendant has failed to meet his burden to show that the trade
7  secret information is both relevant and necessary to any claim or defense. (Doc. 65).

**II.     Motion for Protective Order**

A. Law

Pursuant to Federal Rule of Civil Procedure 26(b), "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense . . . ." "Generally, the public can gain access to litigation documents and information produced during discovery unless the party opposing disclosure shows 'good cause' why a protective order is necessary." *Phillips ex rel. Estates of Byrd v. Gen. Motors Corp.*, 307 F.3d 1206, 1210 (9th Cir. 2002). Pursuant to Federal Rule of Civil Procedure 26(c), "[t]he court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including . . . requiring that a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a specified way . . . ." Fed. R. Civ. P. 26(c)(G).

"For good cause to exist, the party seeking protection bears the burden of showing specific prejudice or harm will result if no protective order is granted." *Phillips*, 307 F.3d at 1210–1211. "If a court finds particularized harm will result from disclosure of information to the public, then it balances the public and private interests to decide whether a protective order is necessary." *Id.*

"Rule 26 vests the trial judge with broad discretion to tailor discovery narrowly." *Crawford-El v. Britton*, 523 U.S. 574, 598 (1998). In particular, "[a]lthough [Rule 26(c)] contains no specific reference to privacy or to other rights or interests that may be

implicated, such matters are implicit in the broad purpose and language of the Rule." *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 35 n. 21 (1984). However, "'there is no absolute privilege for trade secrets and similar confidential information.'" *Fed. Open Mkt. Comm. of Fed. Reserve Sys. v. Merrill*, 443 U.S. 340, 362 (1979) (quoting 8 C. Wright & A. Miller, Federal Practice and Procedure § 2043, p. 300 (1970)). Rather, the Court must weigh the claim to privacy against the need for disclosure. *Id.*

B. <u>Parties' Arguments</u>

Plaintiffs argue that a protective order is necessary in this case to protect proprietary information and trade secrets contained in two expert reports. Plaintiffs state that they are willing to disclose the information contained in the reports as long as Defendant is precluded from using the information outside of this litigation. Plaintiffs allege that Defendant has publically disparaged their company and publishes court documents on his blog, leading Plaintiffs to believe that Defendant intends to publish any documents acquired through this litigation. (Doc. 51 at 2). Plaintiffs state that as a private company, their private financial records are entitled to protection. Plaintiffs further state that although FC's specific formulation is not identified in Dr. Davis's chemical comparison report, the report contains information on "chemical comparisons among [FC] and canola oil and soybean oil[,]" and "provides data not generally known to the public that could be used, in combination with previously disclosed information, to narrow down or identify the components of the trade-secret formulation." *Id.* at 3–4. Plaintiffs further explain that protection of Dr. Davis's report is necessary because FC's formulation is a closely guarded trade secret and that their competitors have gone to great lengths to obtain the formula. *Id.* at 4.

Defendant contends that the two expert reports do not contain any information that qualifies for protection under Rule 26(c) and that Plaintiffs have failed to show good cause for protecting the reports. Defendant states that because Dr. Linsley's report on Plaintiffs' economic losses contains some information that was already disclosed in the

Fennell action,[1] there is no basis to protect it here. (Doc. 60 at 9–11). Defendant does not oppose an order protecting Plaintiffs' private tax and other financial data that has not been previously disclosed. (Doc. 60 at 17). Defendant further argues that Dr. Davis's chemistry report is so heavily redacted that Defendant is unable to determine whether there is good cause to protect it, but regardless, the report does not identify FC's components or its formula and thus does not qualify for protection. *Id.* at 11. Defendant further argues that FC's formula is not a trade secret because most of the formula's details have already been disclosed by Plaintiffs and because the formula can easily be discovered with testing; thus, there is no basis to protect Davis's report. *Id.* at 12, 16.[2]

In response to Defendant's arguments, Plaintiffs note that they are not asking to withhold the reports—they just want the information contained in the reports kept confidential. (Doc. 64 at 1). Plaintiffs state that Dr. Linsley's report contains new information not previously disclosed in the Virginia action and maintain that this sales and profit/loss information should be kept confidential. *Id.* at 2. As to Dr. Davis's report, Plaintiffs state that the report addresses the following questions: 1) whether it is necessary to know FC's formula to compare it to soybean and canola oil; 2) whether the test used by Defendant is a suitable technique; 3) whether the test shows a difference between FC's formula and canola and soybean oils; and 4) whether it is possible that

---

[1] Plaintiffs state that George Fennell is a competitor who set out to harm Plaintiffs by falsely spreading rumors that FC is Crisco cooking oil. (Doc. 11 at 45). Plaintiffs filed suit against Fennell in Virginia and have since settled.

[2] However, Defendant also directly contravenes this argument in his Reply to his Motion to Compel, contending that without knowing which three oils comprise FC, an expert would have to compare FC with thousands of possible three-oil blends—in other words, the formula cannot be easily discovered without lengthy testing. (Doc. 67 at 9–10).

The Court also notes that Defendant's assertion that "most if not all of the details of the formula have already been publically disclosed by Plaintiffs" is plainly false. (Doc. 60 at 12). Plaintiffs aver that the only two individuals who know FC's specific components and formulation are Edward and David Sugg (Doc. 51 Ex. A), and Plaintiffs' patent application does not identify the specific oils used in FC; rather, the patent application notes that FC is comprised of at least three different vegetable oils and then provides a list of 16 different possible oils (Doc. 11 Ex. A at 15). This hardly qualifies as publically disclosing FC's formula.

canola or soybean oil are components of FC. *Id.* at 2–3. Plaintiffs allege that public disclosure of this information will put Plaintiffs at a competitive disadvantage. *Id.* at 4. Plaintiffs further state that Rule 26 does not limit confidential business information to only trade secrets, and that the Court does not have to determine whether Plaintiffs do in fact have any trade secrets in ruling on the Motion for Protective Order. *Id.* at 3.

### C. Analysis

Importantly, Plaintiffs do not object to disclosing the information in the two expert reports—Plaintiffs simply request that the use of the reports be limited to this litigation, that the information in the reports not be publically disclosed, and that the reports be returned to Plaintiffs at the conclusion of this lawsuit. The Court finds this request is reasonable, and will grant Plaintiff's motion.

While Defendant spends much of his Response arguing why FC's formula does not qualify as a trade secret, it is not necessary for the Court to determine whether FC's formula constitutes a trade secret in order to resolve Plaintiffs' motion. As Plaintiffs point out, Rule 26(c) extends protection to other confidential business information, not just information that specifically qualifies as a trade secret. Thus, for purposes of Plaintiff's Motion for Protective Order, the Court need only determine whether the information Plaintiffs wish to keep confidential qualifies for protection under Rule 26(c).[3]

Here, the Court finds that Plaintiffs have met their burden under Rule 26(c). Plaintiffs have shown good cause to keep Dr. Linsley's report confidential because FireClean is a private company and the report contains Plaintiffs' private financial information. While Defendant argues that there is no need to keep the information confidential because the same or similar information was already disclosed in the Fennell action, Defendant also states that he does not oppose an order protecting Plaintiffs' private financial information. And, Plaintiffs explain that Dr. Linsley's report contains more recent information that has not been previously disclosed.

---

[3] Likewise, Defendant's argument that because Plaintiffs have failed to show that FC's formula is a trade secret, nothing in Davis's report constitutes confidential or proprietary information entitled to protection, simply makes no sense.

- 6 -

The Court further finds that Plaintiffs have shown good cause to keep Dr. Davis's chemistry report confidential. While the report does not contain FC's specific formulation or ingredients, it does contain information and test results indicating whether there are differences between FC and soybean or canola oil, and whether it is possible that either of these oils are components of FC. The Court finds that disclosure of this information could place Plaintiffs at a competitive disadvantage.

Having found that disclosure of the information in the reports will likely result in harm to Plaintiffs, the Court must balance the public and private interests to determine whether a protective order is necessary. *Phillips*, 307 F.3d at 1210–1211. The factors the Court considers are:

> (1) whether disclosure will violate any privacy interests; (2) whether the information is being sought for a legitimate purpose or for an improper purpose; (3) whether disclosure of the information will cause a party embarrassment; (4) whether confidentiality is being sought over information important to public health and safety; (5) whether the sharing of information among litigants will promote fairness and efficiency; (6) whether a party benefitting from the order of confidentiality is a public entity or official; and (7) whether the case involves issues important to the public.

*In re Roman Catholic Archbishop of Portland in Oregon*, 661 F.3d 417, 424–25 n.5 (9th Cir. 2011) (citing *Glenmede Trust Co. v. Thompson*, 56 F.3d 476, 483 (3d Cir. 1995)).

First, disclosure of the expert reports will violate Plaintiffs' privacy interests in their private financial information and their confidential business information. Second, Defendant properly seeks disclosure of the reports pursuant to the discovery rules for use in this litigation; however, if the reports are not subject to a protective order, Plaintiffs have alleged that they have good reason to believe that Defendant may publish the reports on his personal blog. Third, disclosure of the reports may cause Plaintiffs embarrassment to the extent that their sales have evidently fallen since publication of Defendant's alleged defamatory statements. Fourth, the reports do not contain information important to public health or safety. Fifth, sharing the information among litigants will promote fairness; however, disclosing the information to Defendant for purposes of this lawsuit

does not necessarily mean it must also be publically disclosed. Sixth, none of the parties to this action are public entities or officials. Finally, Judge Soto has previously found that this case involves issues important to the public. While the undersigned does not dispute that finding, it is not necessary to publically reveal Plaintiffs' private financial information or the chemistry report detailing the similarities or differences between FC and canola and soybean oil in order to prove the truth or falsity of Defendant's statements. Accordingly, the undersigned finds that the balance between public and private interests weighs in favor of granting Plaintiff's motion.

**III.     Motion to Compel**

Defendant moves the Court for an order requiring Plaintiffs to respond to several interrogatories and a document request. Defendant argues that even if FC's formula is a trade secret, Defendant is still entitled to discovery in order to prove whether his statements about FC are true. (Doc. 61 at 2). However, the parties appear to have different theories as to what Defendant actually meant when he published his statements that FC was "probably" just vegetable oil, thus making the present Motion to Compel more complicated than it might seem at first glance.[4]

    A. Law

As noted above, Federal Rule of Civil Procedure 26(b)(1) allows parties to "obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense . . . ." When a party fails to respond or refuses to comply with a discovery request, the requesting "party may move for an order compelling disclosure or discovery . . . [including] an answer, designation, production, or inspection . . . if . . . a party fails to answer an interrogatory . . . or a party fails to produce documents . . . ." Fed. R. Civ. P. 37(a)(3)(B).

---

[4] Defendant notes that what his blog post actually said was that "FireClean is probably a modern unsaturated vegetable oil, virtually the same as many oils used for cooking." (Doc. 61 at 3 n. 1). Defendant further notes that in the same blog post, he also said he did not believe that FC was Crisco because "it wouldn't really make sense to buy a name brand product at a high price if the goal was to resell and make money." (Doc. 61 at 3 n. 2).

- 8 -

B. <u>Interrogatories</u>

Defendant's first interrogatory asks whether FC contains any vegetable oil, and if so, what percentage of the product is and is not vegetable oil. Defendant notes that this request does not ask for the specific formula, names of ingredients, or proportions, and is therefore not seeking trade secret information. (Doc. 61 at 8). Plaintiffs state that they already answered that FC "is comprised of at least three distinct plant-based oils, and that the selection of oils comprises over 99% of the formulation. It can easily be calculated that less than 1% of the formulation is something other than that blend of oils." (Doc. 65 at 3).

Defendant's second interrogatory asks Plaintiffs to identify each ingredient in FC and its percentage of the total product. Defendant argues that even if FC's formula is a trade secret, Plaintiffs can still be compelled to provide this information under a protective order. (Doc. 61 at 13). Defendant also notes that Plaintiffs stated that someone would need more than just the ingredients and percentages to produce a copycat product, and therefore Plaintiffs cannot justify refusing to answer Interrogatory No. 2. *Id.*

Defendant's third interrogatory asks Plaintiffs to state the name of every ingredient in FC and the name of the vendor the ingredient was purchased from. Defendant maintains that he is not seeking the specific formula, just the names of the ingredients and the suppliers in order to identify the records custodians who will be able to verify the ingredients used. (Doc. 61 at 14).

In response to the first, second, and third interrogatories, Plaintiffs allege that FC's formula, the sources of its components, method of production, and research and development are all trade secrets, and that Defendant's requests for the components, percentages, and vendors are an attempt to discover the trade secrets. (Doc. 65 at 3–4). Plaintiffs further note that the question of whether a protective order will adequately protect the information need only be addressed after Defendant establishes that the information sought it both relevant and necessary to a claim or defense, and suggest that such an order may not be adequate here because of the risk that Defendant will expose

information about FC to its competitors. (Doc. 65 at 14).

## 1. Analysis

### a. *Whether the information qualifies as a trade secret*

In trade secret discovery disputes, "the party opposing discovery must [first] show that the information is a 'trade secret or other confidential research, development, or commercial information,' under Rule 26(c)(7) and that its disclosure would be harmful to the party's interest in the property." *In re Remington Arms Co., Inc.*, 952 F.2d 1029, 1032 (8th Cir. 1991).

Pursuant to the Arizona Trade Secrets Act,

> "Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique or process, that both:
>
> (a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
>
> (b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Ariz. Rev. Stat. Ann. § 44-401. "This rather expansive definition emphasizes the secrecy of the alleged trade secret, as well as the competitive advantage afforded by it." *Enter. Leasing Co. of Phoenix v. Ehmke*, 197 Ariz. 144, 149 (App. 1999). The Restatement of Torts provides additional guidance by adopting a six-factor test:

> (1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

Restatement (First) of Torts § 757 cmt. b (1939).

Here, the Court finds that FC's formula qualifies as a trade secret. Plaintiffs have taken substantial steps to ensure that the formula remains secret, and aver that only the

two Sugg brothers know FC's components and formula.[5] *See Enter. Leasing Co.*, 197 Ariz. at 150 ("the most important factor in gaining trade-secret protection is demonstrating that the owner has taken such precautions as are reasonable under the circumstances to preserve the secrecy of the information."). Plaintiffs also derive significant economic value from FC's formula because it gives them a competitive advantage in the gun lubricant industry. If that formula became public knowledge, then Plaintiffs' competitors would be able to produce a same or similar product and effectively ruin Plaintiffs' business.

While Defendant argues that Plaintiffs have already publically revealed FC's formula in their patent application,[6] Plaintiffs' patent application does not actually disclose the formula nor any of the specific ingredients used in FC— it provides a list of 16 oils and states that FC is comprised of a three-oil blend, but does not specify which oils or their percentages. *See W.L. Gore*, 872 F.Supp.2d at 899 ("Disclosure of a trade secret in a patent places the information comprising the secret into the public domain and eliminates trade secret protection" (internal quotations and citation omitted)).

The Court also finds it significant that in the Fennell action, the Virginia court found that Plaintiffs had sufficiently established that FC's formula is a trade secret. (Doc. 65 Ex A).[7]

. . .

---

[5] Plaintiffs state that FC has "kept secret the formula of its product, the sources of its components, the methods involved in producing and bottling it, and many of the research and development efforts used to develop the product." (Doc. 65 at 5). Edward Sugg declared that FC's formula is not publically available and that he and his brother are the only two individuals who know the formula and have gone to great lengths to protect it. (Doc. 51 Ex. A at ¶¶ 6–8).

Plaintiffs further state that they have "worked diligently to protect their trade secrets because the greatest asset the company has is its product[,] . . . [and i]f the formulation became public knowledge, or if the company voluntarily discloses it, the harm to the company would be disastrous." (Doc. 65 at 7).

[6] See n. 2 above

[7] Plaintiffs note that in that case, the court denied Fennell's motion to compel disclosure of FC's formula, and further denied Fennell's two subsequent motions for reconsideration. (Doc. 65 at 8).

### b. *Whether Defendant has shown that the information is both relevant and necessary to a claim or defense*

After establishing that the information sought to be protected is a trade secret, "[t]he burden then shifts to the party seeking the discovery to demonstrate that the information is relevant and 'necessary to prepare the case for trial.'" *Trevino v. ACB American, Inc.*, 232 F.R.D. 612, 617 (N.D. Cal. 2006) (quoting *In re Remington*, 952 F.2d at 1032). "If the party seeking discovery fails to show both the relevance of the requested information and the need for the material in developing its case, there is no reason for the discovery request to be granted." *In re Remington*, 952 F.2d at 1032.

Here, the question of relevance is complicated by the fact that the parties have different understandings of what Defendant actually meant by his statements. From Plaintiffs' perspective, taking into account all of Defendant's statements as well as Fennell's statements, the gist of Defendant's comments is that FC is simply repackaged Crisco or generic vegetable oil; more specifically, FC is common soybean or canola oil, a single oil that can be purchased at the grocery store, but not a proprietary blend of three oils. *See* Doc. 61 at 6, Plaintiffs' Answer to Interrogatory No. 1; Doc. 61 Ex. B, letter from Plaintiffs' counsel ("The veracity of Mr. Tuohy's statements about FIREClean's composition and whether the Suggs or their company lied about it hinge on whether FIREClean is the same as, or is mostly the same as, either canola oil or soybean oil."); Doc. 65 at 2. Thus, Plaintiffs argue that "the components and exact percentage of FIREClean®'s components are not necessary to prove the truth, substantial truth, or falsity of any of Mr. Tuohy's statements or implied allegations about FIREClean®'s composition and formulation. . . . The formulation could reveal what FIREClean® is, but for purposes of Mr. Tuohy's allegations, the relevant information is what FIREClean® is **not**." (Doc. 61 Ex. D at 45). Plaintiffs further argue that because it is indisputable that FC contains a mix of plant-based oils, which specific oils it contains is irrelevant—thus, "what FIREClean® is will be relevant only to the extent of determining whether FIREClean® contains a mix of plant-based oils." (Doc. 65 at 9–10).

Plaintiffs also argue that Defendant does not need to know FC's formula, components, or vendors in order to prepare his case for trial because Dr. Davis's report establishes that scientific testing can be used to make comparisons between FC and other commercially available oils, and therefore revealing FC's specific ingredients or percentages is unnecessary for a factfinder to assess whether it is true or false that FC is the same as canola or soybean oil. (Doc. 65 at 10; Doc. 61 Ex. B).[8] Plaintiffs state that they have already disclosed test results to Defendant showing that FC is not the same or substantially the same as canola or soybean oil, and argue that Defendant does not need FC's formula in order to confirm or challenge those results. (Doc. 65 at 12; Doc. 61 Ex. D at 44). Plaintiffs also state that they can disclose the fatty acid percentages of FC's components and are willing to do so with a protective order in place. (Doc. 61 Ex. B).

Finally, Plaintiffs note that if Defendant's argument to the jury is that his statements were referring to FC as a blend of plant-based oils, then he already has admissions and evidence of that fact and he does not need FC's formula to present that theory to the jury. (Doc. 65 at 12–13).

From Defendant's perspective, there is no material difference as to whether his comment that FC was probably just vegetable oil was referring to a single oil or to an oil blend; the point is that Plaintiffs misrepresented the revolutionary nature of their product by falsely suggesting that it is different from common vegetable oil. (Doc. 61 Ex. A; Doc. 67 at 3–4).[9] Thus, Defendant believes he is entitled to pursue discovery showing that FC contains vegetable oil of any kind, from any brand. (Doc. 67 at 2). Defendant further argues that the issue of where Plaintiffs purchased their ingredients is relevant to his claim that Plaintiffs have taken a product commonly used in one sphere and introduced it

---

[8] In their response to Defendant's discovery request, Plaintiffs included a declaration from Dr. Davis from the Fennell litigation wherein he opined that it was not necessary to know FC's specific formula in order to conduct chemical comparison of FC to Crisco or generic canola or soybean oil. (Doc. 61 Ex. D Attach. 1).

[9] Defendant further argues that "Plaintiffs' admission that FIREClean is 'at least 99% vegetable oil' should be (and likely will be) largely dispositive of their claims as a matter of law." (Doc. 61 at 4). However this issue is not relevant to the present motions and is more appropriately addressed in a motion for summary judgment.

to another sphere—specifically, Defendant believes that Plaintiffs are purchasing jugs of generic canola and other oils from Restaurant Depot and repacking them. (Doc. 61 at 14).

While both parties make strong arguments regarding relevance and necessity, to paraphrase the court in *In re Remington*, discovery should be denied unless Defendant establishes the relevance of FC's trade secret formula to his case, demonstrates a true need for the information, and shows that the potential harm to Plaintiffs is outweighed by his need for discovery. 952 F.2d at 1033. The Court finds that Defendant has failed to meet that burden here. For purposes of Defendant's argument that FC is nothing more than common vegetable oil used for cooking, Plaintiffs have already provided chemical testing evidence that FC is not the same or substantially the same as canola or soybean oil. Plaintiffs are also willing to disclose test results showing FC's fatty acid composition, and will provide samples of FC if Defendant would like to conduct further testing to compare FC to other oils. Further, as Plaintiffs point out, if Defendant's argument is that his statements were referring to FC as a blend of plant-based oils and not just a single oil, then Defendant already has evidence to support this argument in the form of Plaintiffs' patent application describing FC as a blend of at least three plant-based oils as well as Plaintiffs' answer to Interrogatory No. 1.

c. *Weighing the harm of disclosure to Plaintiffs against the harm of withholding the information from Defendant*

If the party seeking discovery establishes that the information is relevant and necessary, the Court "must then weigh the risk of disclosure of the trade secret to unauthorized parties with the risk that a protective order will impede prosecution or defense of the claims." *Trevino*, 232 F.R.D. at 617; *see also In re Remington*, 952 F.2d at 1032 ("the court must weigh the injury that disclosure might cause to the property against the moving party's need for the information.").

Assuming for the sake of argument that Defendant has shown relevance and necessity, requiring Plaintiffs to disclose FC's ingredients and formula would undoubtedly cause great harm to Plaintiffs. FC is the only product Plaintiffs produce, and

if the formula were to become public knowledge, Plaintiffs could effectively be forced out of business if their competitors produced a copycat product at a lower price point. On the other hand, if the Court does not compel Plaintiffs to disclose FC's ingredients and percentages, then it may be more difficult for Defendant to prove his allegation that FC is nothing more than common vegetable oil because Defendant may have to conduct further chemical testing to compare FC to other plant-based oils. However, Plaintiffs state that they have already provided testing results to Defendant showing that FC is not the same or substantially the same as soybean or canola oil, and further state that they are willing to disclose additional testing showing FC's fatty acid composition.

While both parties have compelling interests in this case, the Court finds that Plaintiffs' interest in maintaining the secrecy of their only product outweighs Defendant's interest in knowing FC's exact ingredients and formula. Further, the Court is not convinced that a protective order will adequately protect the trade secret information in this case. Given Plaintiffs' allegations that Defendant has aided and abetted George Fennell, one of Plaintiffs' competitors, in attempting to expose FC's formula, and that Defendant has previously published court documents on his blog, there is a risk that Defendant will disclose Plaintiffs' trade secret information to others outside of this litigation. Defendant's response that Plaintiffs would be able to file suit for trade secret infringement does little to assuage the economic harm that Plaintiffs would suffer should FC's formula be revealed. *See In re Remington*, 952 F.2d at 1033 ("for once the information is wrongfully released, the trade secret is lost forever and no sanction imposed on the violator can retrieve it.").

2. Conclusion

Accordingly, based on the foregoing analysis, the Court finds that Plaintiffs should be required to fully respond to Defendant's Interrogatory No. 1 because this interrogatory only requires Plaintiffs to state what percentage of FC is and is not vegetable oil and does not seek any confidential or trade secret information such as FC's exact formula or the specific percentage of each oil in the formula. Further, Plaintiffs' answer to Interrogatory

No. 1 does not require that they admit or agree with Defendant's position as to the meaning of his allegedly defamatory statements. As to Interrogatories No. 2 and No. 3, the Court finds that the information requested qualifies as a trade secret and that a protective order would not be adequate in this case to prevent unauthorized disclosure of the information. Plaintiffs are therefore not required to respond to Interrogatory No. 2 or No. 3.

### C. Document Request

Defendant's first document request asks Plaintiffs to produce a copy of their settlement agreement with Mr. Fennell from the Virginia action. Defendant maintains that the agreement is relevant under A.R.S. § 12-2504 because Plaintiffs allege Defendant conspired with Fennell. (Doc. 61 at 16). Defendant contends that the statute clearly applies because Plaintiffs are alleging that Defendant acted in concert with Fennell and that he is jointly and severally liable for at least some of Fennell's conduct.

Plaintiffs argue that they are contractually obligated to keep the settlement agreement confidential and that judicial and public policy interests favoring confidentiality support keeping the information secret. (Doc. 65 at 15). Plaintiffs further argue that A.R.S. § 12-2504 does not apply to Plaintiff's aiding and abetting claim because the statute is specific to joint and several liability, which Plaintiffs are not alleging, and because it requires "acting in concert," which is a greater showing than aiding and abetting. *Id.* at 16. Finally, Plaintiffs argue that even if the statute did apply here, the only relevant information from the settlement agreement is the settlement amount, and that would only be relevant if judgment is entered against Defendant for the aiding and abetting claim. (Doc. 65 at 17).

#### 1. Law

Pursuant to the Uniform Contribution Among Tortfeasors Act, "[i]n an action for personal injury, property damage or wrongful death, the liability of each defendant for damages is several only and is not joint, except as otherwise provided in this section." A.R.S. § 12-2506(A). Section 12-2504 governs joint and several liability in cases of a

release or covenant not to sue:

> If a release or a covenant not to sue or not to enforce judgment is given in good faith to one of two or more persons liable in tort for the same injury or the same wrongful death both of the following apply:
>
> 1. It does not discharge any of the other tortfeasors from liability for the injury or wrongful death unless its terms so provide, but it reduces the claim against the others to the extent of any amount stipulated by the release or the covenant or in the amount of the consideration paid for it, whichever is the greater.
>
> 2. It discharges the tortfeasor to whom it is given from all liability for contribution to any other tortfeasor.

A.R.S. § 12-2504. However, while § 12-2504 has not been abrogated, § 12-2506 subsequently abolished joint and several liability except in the following limited circumstances:

> D. The liability of each defendant is several only and is not joint, except that a party is responsible for the fault of another person, or for payment of the proportionate share of another person, if any of the following applies:
>
> 1. Both the party and the other person were acting in concert.
>
> 2. The other person was acting as an agent or servant of the party.
>
> 3. The party's liability for the fault of another person arises out of a duty created by the federal employers' liability act, 45 United States Code § 51.

A.R.S. § 12-2506(D). The statute further defines "acting in concert" as:

> [E]ntering into a conscious agreement to pursue a common plan or design to commit an intentional tort and actively taking part in that intentional tort. Acting in concert does not apply to any person whose conduct was negligent in any of its degrees rather than intentional. A person's conduct that provides substantial assistance to one committing an intentional tort does not constitute acting in concert if the person has not consciously agreed with the other to commit the intentional tort.

A.R.S. § 12-2506(F).

In contrast to "acting in concert," to "[a]id and abet means simply to encourage,

- 17 -

counsel, advise or assist in the commission of an act." *Ramirez v. Chavez*, 71 Ariz. 239, 243 (1951). Thus, acting in concert requires a greater showing that the parties entered into a conscious agreement, whereas aiding and abetting is a much lesser showing that a party rendered assistance "by acts or words of encouragement or support." *Id.*

2. Analysis

Assuming that Plaintiffs are contractually required to keep the settlement agreement from the Virginia action confidential unless otherwise ordered by the Court, the Court finds that Plaintiffs shall not be compelled to produce the settlement agreement at this point in the litigation for the following reasons.

First, it is unclear at this juncture whether A.R.S. § 12-2504 will apply. Count Six of Plaintiffs' complaint states a cause of action for "aiding and abetting George Fennell's tortious conduct." (Doc. 11 at 45). It does not directly state a claim for acting in concert or joint and several liability. However, Count Six also alleges that "Mr. Fennell and Mr. Tuohy agreed to help each other publish false and disparaging statements about the Plaintiffs." (Doc. 11 at 46 ¶342). Thus, Plaintiffs are arguably making a claim that Defendant and Fennell acted in concert by "entering into a conscious agreement to pursue a common plan or design to commit an intentional tort." A.R.S. § 12-2506(F). However, "[a] prima facie case under A.R.S. § 12–2506(D)(1) requires proof supporting the conclusion that the parties made a conscious agreement to commit an intentional tort — not a tort that involves merely negligence 'in any of its degrees'—and actively took part in the intentional tort." *Mein ex rel. Mein v. Cook*, 219 Ariz. 96, 99 (Ct. App. 2008). Thus, it is also possible that Plaintiffs will be unable to make this showing at trial and therefore § 12-2504 would not apply.

Second, if a jury does find Defendant guilty of Count Six, and if the Court determines that A.R.S. § 12-2504 does apply, then only the amount of the settlement agreement between Plaintiffs and Fennell is relevant, not the entirety of the agreement. Thus, there is no reason for Plaintiffs to produce a copy of the settlement agreement at this point in the litigation.

Finally, the Court notes that there are strong public policy and judicial reasons that support keeping settlement agreements confidential. *See Kalinauskas v. Wong*, 151 F.R.D. 363, 365 (D. Nev. 1993) ("Confidential settlements benefit society and the parties involved by resolving disputes relatively quickly, with slight judicial intervention, and presumably result in greater satisfaction to the parties. Sound judicial policy fosters and protects this form of alternative dispute resolution."). While Defendant notes that "the pro-settlement posture of the federal courts does not absolutely shield settlement agreements from disclosure[,]" it is also true that the federal courts have a "policy of encouraging settlements by safeguarding the confidentiality of settlement agreements." *Abbott Diabetes Care Inc. v. Roche Diagnostics Corp.*, 2007 WL 4166030, at *4 (N.D. Cal. Nov. 19, 2007). Further, in *Abbott* the court specifically noted that in order to protect the parties' confidentiality interests, the agreement would be redacted to disclose only those portions of the agreement that were directly relevant. *Id.* Thus, should the Court determine that § 12-2504 does apply here, the Court will order redaction of the agreement to disclose only the settlement amount.

## IV. Conclusion

Accordingly, based on the foregoing, **IT IS HEREBY ORDERED**:

1) Plaintiff's Motion for Protective Order (Doc. 51) is granted.
2) Defendant's Motion to Compel (Doc. 61) is granted in part to the extent that Plaintiffs are hereby ordered to fully respond to Defendant's Interrogatory No. 1. The remainder of the motion is denied.

Dated this 17th day of April, 2018.

Eric J. Markovich
United States Magistrate Judge